**OAK PARK CEMETERY, Inc., v. DONALD-SON et al.**

**No. 11010.**

Court of Civil Appeals of Texas. Galveston.
Oct. 24, 1940.

Rehearing Granted Feb. 27, 1941.

Further Rehearing Denied March 20, 1941.

Edgar Monteith and T. J. O'Brien, both of Houston, for appellant.

Lewis Fogle, of Houston, for J. I. Donaldson and others.

Lawler, Wood & Childress and Virgil Childress, all of Houston, for Golden Gate Cemetery.

CODY, Justice.

This is the second appeal of this case. Tex.Civ.App., 110 S.W.2d 119.

Suit was filed by J. I. Donaldson and others for themselves "and all others similarly situated", and on behalf of owners of lots in Oak Park Cemetery, against Oak Park Cemetery, Inc., appellant, and against W. R. Britton, one of the appellees, seeking an injunction to prevent appellant and said appellee from platting into burial lots a part of the cemetery which the petition alleged had been irrevocably dedicated as a "Park" and "Flower Garden" and as a "Caretaker's Home", by the sale of lots to the plaintiffs in the petition with reference to a map upon which said park and flower garden was shown, etc. There were also allegations in the petition of a failure to set aside money realized from the sale of lots in the cemetery for the perpetual care of the lots, etc., but these allegations were not made out, and on appeal have been abandoned, and require no further notice. The allegations made against appellee Britton need not be set forth, for he answered admitting all the allegations in plaintiffs' petition except "in so far as they allege the participation of Britton in the unlawful acts of Oak Park sought to be restrained * * *", and he adopted plaintiffs' pleadings, and their prayer for relief against appellant. Thus,

though in form a defendant, Britton by his pleadings made common cause with plaintiffs against appellant. And Golden Gate Cemetery, which was owned and represented by W. R. Britton, intervened in the suit to enjoin appellant from maintaining walls or fences between the 27-acre cemetery tract of intervenor and the 13-acre cemetery tract of appellant, which adjoined. Intervenor alleged that its 27-acre cemetery tract and appellant's 13-acre cemetery tract were part and parcel of one and the same general cemetery project.

Appellant, defendant below, answered that Donaldson and the other colored plaintiffs were not in good faith bringing suit for themselves but were really suing on behalf of W. R. Britton; that Britton operated Golden Gate Cemetery, which joined Oak Park Cemetery on its rear; that the entrance to both cemeteries was effected through the same gateway. Appellant further answered: That the map or plat referred to in plaintiffs' petition (as being the map with reference to which cemetery lots were sold), was prepared by Britton, but was never recorded, and was never intended to be recorded. That said plat was circularized by Britton as an advertising scheme under the label of "An Artist's Conception of Oak Park Cemetery." That plaintiffs acquired no vested rights under said plat. That the "Applications to Purchase", which were used by prospective purchasers, expressly provided that Britton should not be required to file the aforesaid plat of the cemetery for record or execute deeds until 400 lots had been sold and paid for. That 400 lots were never sold, and 400 applications for purchasing lots were never received during Britton's ownership. That in order to meet the expenses of operating and maintaining Oak Park Cemetery in proper condition it was necessary to plat into burial lots the area shown on Britton's unrecorded map as the "Park" and "Flower Garden" and "Caretaker's Home". That appellant acted in good faith and for the best interest of said cemetery and the lot owners therein by so doing. That such re-platting did not interfere with the rights of any lot owner, or with the free and unobstructed access to his lot, nor did it impair the value of any lot, but, on the contrary, enhanced it. Appellant further pled that any so-called agreements made by Britton to establish the park and flower garden were not binding on appellant, and if in

fact made, were only oral; and because oral, could confer no interest in real estate because contrary to the Statute of Frauds. That Britton during his ownership made no irrevocable dedication of the 13-acre tract in conformity with his aforesaid unrecorded map; but that appellant made a formal dedication by filing a map for record in the Map Records of Harris County. That plaintiffs took title to their lots only after the so-called "Park" and "Flower Garden" had been re-platted into burial lots and after such re-plat had been filed for record, and acquired title subject to such re-plat.

At the conclusion of the case, appellant moved for an instructed verdict, which the court refused. The case was submitted to the jury on special issues, which special issues, and the answers thereto, were as follows:

"Special Issue No. 1.

"Do you find from a preponderance of the evidence that before May 4, 1929, W. R. Britton dedicated those portions of Oak Park Cemetery lying west of Elias Dibble Lane and designated on his map as 'Oak Park and Flower Garden' as a park for the use of the lot owners in said cemetery and for their friends and relatives as a place of resort and for the purpose of location of a florist and flower garden and not to be subdivided into lots and blocks for burial purposes?"

Jury's answer: "He did so dedicate the same."

"By the word 'dedication', as hereinbefore used, is meant a clear and unmistakable manifestation by the owner that land belonging to him has been irrevocably set apart by him for the use of a particular group of persons intended to be benefitted thereby."

"By 'irrevocably', as herein used, is meant that the same shall be beyond the recall of the dedicator."

"Special Issue No. 2.

"Do you find from a preponderance of the evidence that the plaintiff, J. I. Donaldson, relied upon such dedication (if you have found that W. R. Britton did so dedicate) in purchasing a lot in Oak Park Cemetery from defendant, W. R. Britton?"

Jury's answer: "He relied upon such dedication."

After refusing appellant's motion for judgment "non obstante veredicto", the court granted the motion for judgment on the verdict for appellees, perpetually restraining appellant "from converting, using, preparing for use, selling or devoting in any way to the purpose of burial that portion of Oak Park Cemetery lying west of Elias Dibble Lane as shown by (appellant's) plat of said cemetery of record in Vol. 10, pp. 9, 10, of the Harris County Map Records". (That is to say, the court perpetually enjoined appellant from cutting up the part of the Oak Park Cemetery which was designated on Britton's unrecorded map as "Park", "Flower Garden", and "Caretaker's Home" into burial lots).

As early as October, 1928, Britton commenced the development of a tract of land near Houston as a cemetery for negroes, which he called "Oak Park Cemetery". It was composed of three contiguous tracts; one of 27.3 acres, and two of 6⅔ acres each, or a total of 40 and a fraction acres. Britton had such tract surveyed and a plat made of the projected cemetery. According to this plat one of the 6⅔ acres fronted on a county road, which adjoined and paralleled a railroad tract, and was designated thereon "Florist and Flower Garden", and "Caretaker's Home", and "Oak Park". There were no burial lots platted on the 6⅔-acre tract which, as stated, fronted on the county road. Adjoining the 6⅔-acre tract, which we have designated the front 6⅔-acre tract, and to its rear, was the other 6⅔ acres: then to the rear of the second or rear 6⅔-acre tract was the 27.3-acre tract. Burial lots were platted in 13 blocks, which were situated on this rear 6⅔-acre tract and the adjoining 27.3-acre tract, with streets between such 13 blocks. Britton did not record this plat, but did use it in advertising his projected cemetery among the negroes of Houston. After he had contracted for the sale of some 75 or 100 lots, Britton negotiated a loan with the American Trust Company. He secured the loan with a lien upon the two 6⅔-acre tracts, and upon a 44-acre tract, which included the 27.3-acre tract aforesaid. The deeds of trust given to secure the loan contained this provision for partial releases: "W. R. Britton shall have the privilege of partial release upon individual lots into which the above described property is to be subdivided for the purpose of being used as a cemetery, in accordance with the provisions of a written contract of even date * * *."

The contract so referred to contained, among others, this language:

"* * * it is understood and agreed that the above described real estate is to be subdivided by W. R. Britton and made into what is to be known as 'Oak Park Cemetery' in accordance with a plat hereto attached, marked 'Exhibit A' * * * and that the said W. R. Britton contemplates selling lots or plats, in said cemetery to be used for the purpose of sepulture."

"* * * that W. R. Britton is to use such money as is advanced to him by the American Trust Company for the purpose of developing said property into a cemetery and putting the same upon the market, and it shall be used for no other purpose."

"* * * It is further agreed and understood that all sums advanced to W. R. Britton by said Trust Company shall be used either for the purpose of paying off and refunding outstanding vendor's lien notes against said land and premises, or for the purpose of developing, advertising and placing on the market said property as a cemetery * * *."

The plat referred to in the aforesaid contract as "Exhibit A" was the unrecorded Britton plat, showing the front 6⅔-acre tract dedicated to ornamental purposes in the scheme of the proposed cemetery.

Thereafter, on June 19, 1930, American Trust Company released from the deed of trust 19 lots in Block 7, according to Britton's map, using in part this language: "Whereas, the above described land and premises, the security for the payment of said notes, has been subdivided and platted by W. R. Britton into what is known as 'Oak Park Cemetery', reference to which plat is here made for all purposes of description."

Subsequently 38 more lots were released from its liens by the Trust Company, and this language was employed: "Whereas, the above described three tracts of land, aggregating 40.62 acres, have been subdivided and platted by W. R. Britton into what is known as 'Oak Park Cemetery' reference to which plat is here made for all purposes of description."

Thereafter, because of Britton's default in paying his notes, the deed of trust was foreclosed, and by trustee's deed dated September 2, 1930, the three tracts were conveyed to the American Trust Company, the purchaser at such foreclosure sale.

Subsequently the American Trust Company conveyed said three tracts to three persons who took title in trust to thereafter convey, and who did thereafter convey, the same to Oak Park Cemetery, Inc., a corporation which was organized by the Trust Company to operate said cemetery property. All the stock was owned by the Trust Company.

After appellant acquired title to the aforesaid three tracts of land, less the lots it released as having been sold by Britton, it prepared a new map or plat of the cemetery which was approved by the City Planning Commission on December 9, 1930, and was then duly filed for record. This plat was identical with that prepared by Britton, except, as already indicated, it subdivided into burial lots that portion of the front 6⅔-tract, which is designated on the Britton unrecorded map as "Oak Park" and "Caretaker's Home" and "Flower Garden", fronting on the county road.

Then, about a year subsequent to the date of the foreclosure against Britton, the Hon. Harry Holmes, who owned a second lien against the 27.3-acre tract, which was inferior to that of the Trust Company, redeemed it by paying to the Trust Company the amount of the first lien which it had foreclosed against Britton, and acquired title thereto. Holmes sold it to Golden Gate Cemetery Corporation, which is managed and controlled by Britton. And Britton has recorded a plat of Golden Gate Cemetery which, as to said 27.3-acre tract, is identical with the unrecorded Britton plat, aforesaid, and with that of appellant.

So, Golden Gate Cemetery, consisting of said 27.3-acre tract, is located immediately east of, and to the rear of, Oak Park Cemetery, with a connecting street through the two cemeteries. Both cemeteries have the same entrance, and one getting to Golden Gate Cemetery passes through the main entrance of, and passes through, from the front to rear, Oak Park Cemetery.

■ From the issues submitted to the jury it appears that the case was tried on the theory that the sale of burial lots by the owner of a cemetery, with reference to an unrecorded plat of such cemetery, to purchasers who rely on such plat, will effect a dedication of the drives, parks, etc., shown on said plat, as well as the lots and blocks shown thereon. This principle is well established, of course, as applied to the sale of lots with reference to the plat of a townsite or addition to a city by the owner. Lamar County v. Clements, 49 Tex. 347;

998

Clement v. City of Paris, 107 Tex. 200, 175 S.W. 672.

 While it is true that the grantee of a burial lot in a deed of conveyance does not acquire a fee-simple title, but only acquires the lot limited to its intended burial purposes (11 C.J. 60; 14 C.J.S., Cemeteries, § 25; Brunton v. Roberts, 265 Ky. 569, 97 S.W.2d 413, 107 A.L.R. 1289; People v. Bloomington Cemetery Ass'n, 353 Ill. 534, 187 N.E. 455; Annotation, 67 L.R.A 118), it is clear that such grantee is not the ordinary owner of an easement, and that "his right to have the drives, walks, and approaches kept in repair does not depend upon the law of easements." Houston Cemetery Co. v. Drew, 13 Tex.Civ.App. 536, 36 S.W. 802, 805. See Dunbar v. Oconomowoc Cemetery Ass'n, 189 Wis. 164, 207 N.W. 265; Sheean v. Carra, 145 La. 440, 82 So. 399. In any case, the interest passed by a deed to the purchaser of a burial lot is an interest in land, and we can perceive no valid reason why the same principle should not apply to one who purchases a burial lot in reliance on an unrecorded plat of a cemetery, which applies to the purchaser of a town lot with reference to an unrecorded plat of a town.

Appellant does not deny that the purchase of a burial lot in a cemetery constitutes an interest in land, but to the contrary, insists that because this is so there is no competent evidence in the record to support the findings of the jury. Appellant affirms, and appellees do not deny, that the appellees who proved up deeds to their burial lots, proved up deeds which were executed by appellant, and such deeds referred only to the plat recorded by appellant, which plat did not show the park, etc., here in question. The other appellees, such as Donaldson, held no deed to their lots. Indeed, during the time that Britton was owner of the cemetery, and negotiating sales of the lots, his method of procedure was to accept from a purchaser a printed form of application to purchase a lot, which was signed by the purchaser, and which specified the lot the applicant was purchasing, and the amount he was to pay for it, and the amount of the monthly installment. It also made provision for abandonment if as many as 400 lots were not sold. Now before Britton had sold 400 lots, the Trust Company which had made him the loan, foreclosed its lien, and bought in the cemetery, except the lots which it had theretofore released, and then caused appellant to be created, and transferred the property it had bought in at foreclosure sale. The appellant took over the applications which purchasers had executed to Britton, credited with the payments which had been made to Britton. Whether in so taking over such applications, with payments credited thereon, appellant was acting gratuitously, it is unnecessary to determine. But neither appellant, nor its predecessor in interest, the Trust Company, acquired title to the burial lots at the foreclosure sale which the Trust Company had, previously to such sale, released, under the release clause contained in the loan contract between it and Britton. Among these lots which were released to Britton before the foreclosure sale was the one belonging to appellee Donaldson. Britton by his pleadings admitted that Donaldson owned it, and appellant does not question that Donaldson owns the burial rights in and to his lot. Appellant seeks, however, to drive a wedge, or make a distinction, between the burial rights which Donaldson acquired under the release executed by the Trust Company, and the rights he acquired appurtenant thereto to the use and enjoyment of the park, etc., shown on the Britton unrecorded plat. We do not believe that there is any sound basis for making such distinction. If Donaldson owns the burial rights in and to his lot, he owns the rights appurtenant thereto which he acquired under and by virtue of the release made of his lot by Britton. When Britton received the release from the Trust Company, since he admits that Donaldson paid for the lot and owns it, he received it in trust for Donaldson. In other words, if the legal title to his lot is not in Donaldson, it is in Britton in trust for Donaldson. And when the Trust Company foreclosed its lien, it did not foreclose it as against Donaldson, for it had been released as against Donaldson's lot, and it had been released in reference to the Britton unrecorded plat. The release did not merely effect a release of the burial rights in the Donaldson lot, it released the rights contemplated by the Britton map, according to the evidence before the jury.

 In this connection it will be borne in mind that lands once legally devoted to and used for burial purposes become appropriated to a public purpose, and the power of the body in whom the title is vested to deal with it is very limited. Oakland Cemetery Co. v. People's Cemetery Ass'n, 93 Tex. 569, 57 S.W. 27, 55 L.R.A.

503; Peterson v. Stolz, Tex.Civ.App., 269 S.W. 113. And there had been many burials in the cemetery before the Trust Company foreclosed its lien.

Believing there was sufficient competent evidence to sustain the findings of the jury, the judgment should be affirmed, and it is so ordered.

Affirmed.

On Appellant's Motion for Rehearing.

After careful consideration of appellant's motion for rehearing we have concluded that we were in error in affirming the judgment of the trial court.

As appears from our original opinion, appellees relied upon establishing the dedication of the land for a park, etc., upon the sale of burial lots by the owner of the cemetery with reference to an unrecorded plat to purchasers who bought with reference to such unrecorded plat upon which such park was shown, and in reliance on such unrecorded plat. As appears from our original opinion, all deeds which were introduced in evidence were deeds executed by appellant, and such deeds referred to a plat recorded by appellant upon which the park, etc., was not shown, but the land embraced in such park, etc., was shown being subdivided into burial lots. As further appears from our original opinion, no deed of conveyance was ever executed and delivered to Donaldson conveying to him his burial lot. He signed an application to purchase his lot which contained a provision contemplating that the project might fail and have to be abandoned if as many as 400 lots were not sold by Britton. This very contingency did occur; and before Britton had sold as many as 100 lots he defaulted in payments which were due under the deed of trust securing the indebtedness on the property. Indeed it seems likely that the greatest threat to the success of the project lay in the danger that the holder of the lien against the property which he had subdivided might foreclose such lien for default in payments before the lots were sold off.

■ As further appears from our original opinion before the lien against the property was foreclosed against Britton, the Trust Company had released some sixty lots from the lien, and released the same with reference to the Britton plat, but we have concluded that we were in error in holding in effect that by releasing such lots with reference to the Britton plat, that such release became an adoption of the Britton plat so as to give the owner of a released lot rights in and to the park shown upon such plat, should the project thereafter become abandoned. Had some stranger to the lien bid in the property at the foreclosure sale, it would hardly be contended that such stranger would be bound, because of the releases aforesaid, to maintain the park shown on the Britton plat. The park and flower garden reflected on the map, if considered as touches of beautification or points of attractiveness, must be regarded in nature as no less tentative than the project of which the map was but part and parcel. The right of the owners of the burial lots which were released to have the project continued along its projected lines ceased when much less than 400 lots were sold. It ceased because it was provided that the same should be tentative until 400 of the lots were sold. It is quite possible that if Britton could have sold 400 lots before defaulting and suffering the unsold property to be foreclosed on that he could have succeeded in promoting the project. But his tentative plan, because it failed during the period that it was provided that it should be tentative, cannot be held to have become permanent merely because the lienholder acted thereunder and made releases thereunder. Certainly the purchasers whose applications placed them on notice that the project would remain tentative until 400 lots were sold cannot claim that the sale of 60 lots satisfied the provision that 400 lots be sold. We erred in holding that the release executed by the Trust Company released all the rights which the Britton map contemplated, because the Britton map contemplated, of course, that the project would be successful, and not fail—though, as stated, possible failure had been foreseen, and provided for, if it occurred before 400 lots had been sold.

■ We have carefully re-examined the record and must agree with appellant that the evidence fails to warrant the submission of the special issues to the jury. Indeed appellant did not execute any releases for more than a year after May 4, 1929. And none of the purchasers of burial lots acquired an interest in land in such lots prior to the date of these releases. And since Donaldson frankly stated that he knew about the provisions for abandonment if 400 lots were not sold, above extensively mentioned, any reliance which he placed in the "dedication" is thus obviously

speculative—not the kind that supports estoppel. The court should have instructed a verdict for appellant.

In accordance with these conclusions, appellant's motion for rehearing will be granted, the former judgment of this court set aside, and judgment now rendered reversing the judgment of the trial court and rendering judgment in favor of the appellant. It is so ordered.

Appellant's motion for rehearing granted, former judgment set aside, and cause reversed and rendered.